[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION RE MOTION TO SET ASIDE THE VERDICT AND FOR NEWTRIAL (NO. 114)
What's in a name? The memorable question posed by Juliet is also the question presented by this case. More specifically, it must be determined whether the fact that the plaintiff sued the wrong corporate defendant — or, depending on one's point of view, sued the right corporate defendant under the wrong name — is fatal to his case where he did not discover CT Page 4082-OO his mistake and move to correct it until after the statute of limitations had expired. Because I find that the "right" defendant had notice of the plaintiff's mistake from the beginning, I conclude that the mistake was not, in fact, fatal.
The caption of this decision is the original caption of this case. The plaintiff, Anthony Maulucci ("Maulucci"), filed this action in 1992 against a corporate entity that he described as "St. Francis Hospital and Medical Center Foundation, Inc." (the "Foundation"). The Foundation was the sole defendant. The complaint consists of a single count. It alleges that on April 15, 1990, the Foundation was the owner of a hospital located at 114 Woodland Street in Hartford. Maulucci was a patient in the hospital on that date. He claims to have been injured by falling on a hospital floor that was, he further claims, in a dangerous, slippery condition.
The problem with the caption and allegation just described is that the hospital where Maulucci fell is not owned by the Foundation. Rather, it is owned by a separate corporate entity named "St. Francis Hospital and Medical Center, Inc." (the "Hospital"). As will be seen, this fact was not raised as an issue until the middle of the trial.
The writ, summons and complaint were served on April 7, 1992. They were served, according to the sheriff's return, "in the hands of June S. Piper, B.S.N., A.R.M., Director, Quality Assurance and Risk Management who accepted services for the within named defendant ST. FRANCIS HOSPITAL AND MEDICAL CENTER FOUNDATION, INC., in the said City of Hartford." Although the return is not more precise about the actual place of service, the summons states that the address of the Foundation is 114 Woodland Street in Hartford, and the Foundation has conceded that its offices are indeed located at that address. As already mentioned, Maulucci's complaint alleges that the hospital premises where he fell were also located at 114 Woodland Street.
On May 27, 1992, the law firm of Cooney, Scully Dowling filed an appearance for "The Defendant." The case caption on the appearance form is "ANTHONY MAULUCCI vs. ST. FRANCIS HOSPITAL AND MEDICAL CENTER." The word "Foundation" does not appear on the appearance.
On August 23, 1993, the defendant filed an answer and special defense. The caption of this document is "ANTHONY MAULUCCI VS. SAINT FRANCIS HOSPITAL AND MEDICAL CENTER." The special defense CT Page 4082-PP is that Maulucci's fall was caused by his own negligence in spilling water on the floor while using a sink. The document is signed by counsel for "DEFENDANT, Saint Francis Hospital and Medical Center." The word "Foundation" does not appear in this document. On the same date, the defendant filed a claim for the jury docket. The caption of this latter document is "ANTHONY MAULUCCI vs. SAINT FRANCIS HOSPITAL AND MEDICAL CENTER." The word "Foundation" is absent from this document as well.
On February 27, 1996, the parties filed their respective lists of witnesses in compliance with a pretrial order. The list filed by the defendant named the "Defendant" as "Saint Francis Hospital and Medical Center." Three witnesses are named on that list. Two of them were Eskett Huff and Nadia Nabib. Those witnesses were hospital employees who were present in the hospital at the time of Maulucci's fall. The third witness is "Jane Piper[,] Hartford, CT." Ms. Piper, it will be recalled, is the person who accepted service of process.
On March 14, 1996, the defendant filed a list of pleadings relied upon. The caption of this document is "ANTHONY MAULUCCI VS. SAINT FRANCIS HOSPITAL AND MEDICAL CENTER." On the same date, the defendant filed a list of exhibits with the same caption. The word "Foundation" does not appear in either document.
The Foundation did not at any time file any pretrial motion, dispositive or otherwise, suggesting that Maulucci had sued the wrong entity.
The trial began on March 14, 1996. The opening statements of the parties made it clear, or at least seemed to make it clear, that the issue for the jury to decide was who had spilled the water upon which Maulucci had slipped at the hospital. Maulucci contended that the water had been spilled by a hospital employee. The defense was, or at this stage appeared to be, that Maulucci had spilled the water himself. The capable attorney for the defense gave no hint that the plaintiff had sued the wrong entity.
The plaintiff's only "live" witness in his case in chief was Maulucci himself. Maulucci testified that the water on which he slipped had been spilled by a hospital employee. Maulucci's attorney also read the deposition of Eskett Huff into the record. Ms. Huff was a nursing assistant employed by the hospital at the time of Maulucci's fall. It was conceded that Ms. Huff was CT Page 4082-QQ unavailable for testimony at the time of trial since she had moved out of state.
The actual deposition of Ms. Huff was marked as Exhibit 11 for identification. That document is of considerable interest for purposes of the present motion. The caption of the deposition is "ANTHONY MAULUCCI VS. ST. FRANCIS HOSPITAL AND MEDICAL CENTER." It was "taken at the request of the Defendant" on July 10, 1992, "at St. Francis Hospital and Medical Center, 114 Woodland Street, Hartford, Connecticut." The direct examination was conducted by Attorney David A. Haught of Cooney, Scully Dowling. Attorney Haught stated at the commencement of his direct examination that, "My name is David Haught and I am an attorney representing St. Francis Hospital and Medical Center." Ms. Huff's testimony described the circumstances of Maulucci's fall.
After briefly recalling Maulucci, the plaintiff rested. The defendant did not move for a directed verdict.
The defendant then presented its case. Its first witness was one Lorraine Scrivano. Her testimony was extremely brief, but from a formalistic point of view, extremely devastating. Ms. Scrivano testified that she was a risk analyst employed by "Saint Francis Hospital and Medical Center" and reported to Jane Piper. She further testified that the Foundation was a fund raising entity "totally separate" from the Hospital. More specifically, she testified that "they're involved in fund-raising activities for the hospital." She finally testified that the Foundation had not treated Maulucci at any time.
The defendant also presented the testimony of Nadia Habib, a nurse employed by the hospital. Ms. Habib testified that she had been in the next room when Maulucci fell and had come to Maulucci's aid when she heard the fall. She further testified that Maulucci had admitted spilling the water himself.
After Ms. Habib's testimony, the defendant rested. There was no rebuttal. At this point, the first day of trial was at an end. Counsel were instructed to report to chambers for a charge conference the next morning. See Practice Book § 318A.
When counsel arrived in chambers on the morning of March 15, 1996, Maulucci's counsel immediately filed a request for leave to amend his writ, summons and complaint. The amendment proposed was to replace the named defendant, "Saint Francis Hospital and CT Page 4082-RR Medical Center Foundation, Inc." with "Saint Francis Hospital and Medical Center, Inc." in these documents. The defendant objected. A court reporter was summoned. After hearing brief arguments, the Court made a procedural proposal. The jury was about to arrive. There was no time to do research, and it would not be fair to the jurors to send them home while research was done. Under these circumstances, the Court proposed to grant the plaintiff's motion without prejudice and, in the event of a plaintiff's verdict, to consider the matter with appropriate deliberation in the setting of a posttrial motion. Both parties agreed that this procedure was appropriate. The Court made it clear to defense counsel that a continuance would be granted if requested. None was requested. The plaintiff's motion was granted without prejudice. The jury was informed of this decision.
The jury subsequently rendered a plaintiff's verdict. The verdict was accepted and ordered recorded.
On March 19, 1996, the law firm of Cooney, Scully Dowling entered an appearance for the Hospital "for purposes of Motion to Set Aside Verdict." A motion to set aside the verdict and for a new trial was filed on the same date. Most of the arguments presented in the motion do not require discussion. The verdict was not excessive or against the evidence, and the evidentiary rulings made during the trial were appropriate. As might be expected, however, the Hospital's posttrial motion also contests the court's decision of March 15, 1996, allowing the writ, summons and complaint to be amended. The parties have filed extensive posttrial briefs on this issue, and the matter has now been argued at length. For the reasons set forth below, I conclude that the motion was appropriately granted and that the motion to set aside the verdict must be denied.
Maulucci relies upon Conn. Gen. Stat. § 52-123. That statute provides that, "No writ, pleading, judgment or any kind of proceeding in court or course of justice shall be abated, suspended, set aside or reversed for any kind of circumstantial errors, mistakes or defects, if the person and the cause may be rightly understood and intended by the court." This provision "replaces the common law rule that deprived courts of subject matter jurisdiction whenever there was a misnomer or misdescription in an original writ, summons or complaint."Andover Limited Partnership I v. Board of Tax Review, 232 Conn. 392,396-97, 655 A.2d 759 (1995). Andover sets forth the appropriate analysis to be used when § 52-123 is invoked. It CT Page 4082-SS must first be determined "whether the plaintiff had intended to sue the proper party or whether [he] had erroneously misdirected [his] action." Id. at 397. It is then necessary to use a three-factor test "to determine whether the error was a misnomer and therefore a circumstantial defect under § 52-123." Id. The three factors are: "(1) whether the proper defendant had actual notice of the institution of the action; (2) whether the proper defendant knew or should have known that it was the defendant in the action; and (3) whether the proper defendant was in any way misled to its prejudice." Id.
An application of the Andover analysis leads to the conclusion that the plaintiff was appropriately allowed to amend his writ, summons and complaint. Here, as in Andover, it is absolutely clear that the plaintiff intended to sue the proper party. The allegations contained in the original complaint leave no doubt that Maulucci was complaining about an injury resulting from a dangerous condition in premises owned and controlled by the Hospital. His allegations had nothing to do with the fund-raising activities of the Foundation. Moreover, Maulucci's allegations have been consistent throughout the course of this litigation — from the drafting of his original complaint to the conclusion of trial. No one reviewing these allegations at any time during this entire period could have any doubt that Maulucci intended to sue the Hospital.
The three-factor test to determine whether Maulucci's error was a misnomer and therefore a circumstantial defect under §52-123 leads to a clear conclusion on that issue as well. The factors, listed above, will be considered in turn.
(1) The first factor to be considered is whether the Hospital had actual notice of the institution of the action. The Hospital stipulated at argument that this first factor has been satisfied. It is evident from the facts recited above that this stipulation is well founded.
The Hospital has not stipulated as to the time that it had actual notice of the institution of the action. Although the parties have not specifically addressed this point, there is case authority that the actual notice must occur prior to the running of the statute of limitations. See Schiavone v. Fortune, 477 U.S. 21,31 (1986). This being an action founded upon a tort, the limitations period was three years. Conn. Gen. Stat. § 52-577. The limitations period consequently expired on or about CT Page 4082-TT April 15, 1993. (The exact date is unimportant for present purposes.) There is ample evidence in the record that the Hospital had actual notice of the institution of the action prior to that date. First, the writ, summons and complaint were served on Jane Piper on April 7, 1992. She was served, as already discussed, at the location of the Hospital, viz. 114 Woodland Street in Hartford. Moreover, it is evident from the testimony of Lorraine Scrivano that Ms. Piper was an employee of the Hospital. Ms. Scrivano testified that she (Ms. Scrivano) was an employee of the Hospital and reported to Ms. Piper. It is a fair inference from this testimony that Ms. Piper was an employee of the Hospital as well. Second, as noted above, the caption on the appearance filed by counsel for the defendant on May 27, 1992, stated (or at least strongly implied) that the defendant was the Hospital. Finally, the circumstances of the deposition of Eskett Huff on July 10, 1992, described in detail above, overwhelmingly suggest that the Hospital had actual notice of the action. This was a deposition of a Hospital employee taken at the Hospital by a defense attorney who stated that he represented the Hospital. Even more important, the Foundation had no need to take this deposition in the first place. The question of who spilled the water on which Maulucci had slipped should have been a matter of supreme unimportance to a defendant that was plainly not in control of the premises in the first place. The question of who spilled the water was, however, a matter of profound importance to the entity that controlled the premises, namely the Hospital.
This circumstance leaves no doubt that the Hospital had actual notice of the institution of the action long before the expiration of the limitations period.
(2) The second factor is whether the Hospital knew or should have known that it was the intended defendant in the action. This factor is plainly satisfied by the evidence as well. As already mentioned, the allegation in the complaint is that Maulucci slipped and fell on Hospital premises. The evidence makes it clear that the Hospital controlled these premises and that the Foundation did not. As already discussed, the Hospital had actual notice of the institution of the action. Under these circumstances, the Hospital could have had no doubt that it was the intended defendant in the action.
(3) The third factor is whether the Hospital was in any way misled to its prejudice. The evidence plainly establishes that the Hospital was not misled at all. It is clear that the Hospital was aware either from the commencement of the action or, at a minimum, shortly thereafter, that Maulucci was claiming that he CT Page 4082-UU slipped and fell on Hospital premises. It is also clear that defense counsel actively worked to protect the Hospital's interest throughout the litigation. This was plainly the case, for example, at the deposition of Eskett Huff. It was also the case in the trial itself, where defense counsel went to considerable (if unsuccessful) lengths to show that it was Maulucci, rather than a Hospital employee, who spilled the water. It bears repeating that the Foundation had absolutely no interest in mounting this defense. It could have escaped liability at any time simply by filing a dispositive motion or, in all likelihood, by a telephone call to plaintiffs counsel. The entity running the show, from the beginning of the litigation to the end, was clearly the Hospital.
The Hospital contended at the posttrial argument that, although it was not misled, it was indeed prejudiced by the court's ruling of March 15, 1996, granting Maulucci leave to amend. The Hospital's argument boils down to an anguished plea that it had the case won when Lorraine Scrivano testified and had the proverbial rug yanked out from under its corporate self and looked, perhaps, a little tricky in the bargain when the Court made its ruling of March 15 and informed the jury that the ruling had been made. This argument merits limited sympathy. The jury was instructed to decide the case on its merits. In any event, if the Hospital appeared tricky, that appearance was simply an unavoidable reflection of reality. The Foundation, as just mentioned, could have had the action against it dismissed at any time. It is clear that a strategic decision was made not to do this and, instead, to lie in wait for the plaintiff, setting an ambush for the last possible moment. While there is nothing unethical about this strategy, it is not a strategy that a system that likes to call itself the "justice" system has any interest in supporting. Rather, this strategy sounds suspiciously like "the `sporting theory of justice' condemned by Roscoe Pound [ninety] years ago." Schiavone v. Fortune, supra,477 U.S. at 32-33
(Stevens, J., dissenting). For all of these reasons, the third prong of the Andover test is plainly satisfied. The Hospital was not misled.
This analysis, applying the Andover test, establishes that the misdescription of the defendant in Maulucci's original writ, summons and complaint was merely a misnomer and that the granting of Maulucci's motion to amend those documents was appropriate under § 52-123. The Hospital contends, however, that theAndover analysis should not be used at all. It argues that, "The CT Page 4082-VV plaintiff did not sue a non-existent entity or misdescribed an existing entity. Rather, the plaintiff simply sued the wrong party and cannot correct the mistake after trial by simply amending the complaint under section 52-123." Defendant's posttrial memorandum at 6. This argument raises a rather fundamental question not yet directly addressed by the Supreme Court. Is the Andover analysis — and, by extension, §52-123 — to be used only where the "right" party has been sued under the wrong name, or may it also be used where the "wrong" party is sued under circumstances where both the "right" party and the "wrong" party have actual or constructive notice of the mistake? There is no clear-cut answer to this question, but analysis reveals that it may safely be answered in the affirmative under the somewhat peculiar circumstances of this case.
It is helpful to begin with a review of Supreme Court authority construing § 52-123 in the context of wrongly named defendants. The seminal Connecticut case is World Fire MarineInsurance Co. v. Alliance Sandblasting Co., 105 Conn. 640,136 A. 681 (1927). The plaintiff in World Fire had been injured by the conduct of an entity named the "Alliance Sandblasting Company." This entity was a trade name under which one Julius Goodman did business. That entity occupied the same office as a corporation called the "Alliance Sandblasting Corporation." The original writ was directed against "The Alliance Sandblasting Company, a corporation." Goodman had actual notice. The plaintiff was later permitted to amend its writ by striking out the name of the defendant as it originally appeared and substituting "Julius Goodman doing business under the trade name of the Alliance Sandblasting Company." Id. at 642. The Supreme Court upheld this decision. It explained that, "The plaintiff's mistake was not as to the entity itself — not as to the party sued, but in describing what kind of entity the defendant was; it sued the proper party, but in so doing misdescribed that party, not in respect to name, but solely as to status, as being an artificial instead of a personal entity." Id. at 643. World Fire is thus a case of the "right" party being sued under the wrong description. Correction of such a misdescription under § 52-123 is unproblematic.
Six years after World Fire, the Supreme Court encountered a somewhat different problem in Motiejaitis v. Johnson, 117 Conn. 631,169 A. 606 (1933). The plaintiff in Motiejaitis was injured by the conduct of two partners named Joseph and Albert Johnson, who did business under the name of J. Johnson Sons. The CT Page 4082-WW original writ, however, was directed against "J. Johnson Sons, Incorporated." No corporation by that name existed. "The defendant," however, appeared and contested the action on its merits. After the verdict but before judgment had been entered, the plaintiff was allowed to amend her writ to name the two Johnsons as defendants. Id. at 636-37. The Supreme Court affirmed. "Under the circumstances," it reasoned, "the situation is one where the parties who should have been sued really appeared and defended, although ostensibly another party was named." Id. at 638. Motiejaitis thus occupies something of an intermediate position between World Fire and the instant case. The "right" party is not only misdescribed but misnamed. On the other hand, no "wrong" party is actually served. The party named in the original writ is nonexistent. Although the opinion does not expressly say so, it is a fair inference from the facts recited that service of process was made on the "right" party under the wrong name. No one was misled, so once again amendment under § 52-123 is unproblematic.
More than half a century later, the Supreme Court decidedPack v. Burns, 212 Conn. 381, 562 A.2d 24 (1989). Pack, likeMotiejaitis, was a case of the "right" party being sued under the wrong name. The plaintiff, who alleged that he had been injured by a defective highway, was obliged by statute to sue the Commissioner of Transportation. He instead sued the "State of Connecticut Transportation Commission." No such entity existed. Service of process, however, was made upon an employee of the Commissioner and accepted by the employee on the Commissioner's behalf. The plaintiff later cited in the Commissioner after the statute of limitations had run. Id. at 382-83. The Supreme Court held that, under the circumstances, this amendment "related back to the timely service of the original writ, summons and complaint." Id. at 384. Here, as in Motiejaitis, the "right" party had been sued under a nonexistent name. Correction under § 52-123 was unproblematic.
The Supreme Court's next relevant decision, Lussier v.Department of Transportation, 228 Conn. 343, 636 A.2d 808 (1994), involved a factual scenario somewhat closer to the facts of the instant case. Lussier, like Pack, involved a highway defect action that required service on the Commissioner of Transportation. The defendant actually named in the writ, however, was the "State of Connecticut, Department of Transportation." Here, unlike Motiejaitis and Pack, the entity named in the writ actually existed and was, technically at least, CT Page 4082-XX a separate entity from the "right" party. The actual service of process, however, was made on the Commissioner through his authorized agent. The Supreme Court held that the action was saved by § 52-123. This was a misnomer rather than the designation of the wrong person as a party. 228 Conn. at 350. Here, although the "wrong" party was named and that "wrong" party actually existed, the "right" party was served. Section 52-123
saved the action.
The closest authority to the problem presented here isAndover. Andover was a tax appeal brought by an owner of real property in West Hartford. The plaintiff was statutorily obliged to name the Town of West Hartford as the defendant. The citation instead named the "Board of Tax Review of the Town of West Hartford" as the defendant. The actual service of process was upon an assistant town clerk. The Town appeared for all defendants. 232 Conn. at 394. The Supreme Court held that §52-123 was available to cure the misnomer in the citation. The test that it employed in its analysis has already been described. The important feature of the case for present purposes is that both the "Board" and the "Town" existed and were separate legal entities. Not only was the "right" party (the Town) not named in the citation, but the "wrong" party was actually served. While it is true that an assistant town clerk was served, he was presumably served in his capacity as an agent of the Board. A formalistic argument can be made that in Andover, unlike its predecessors, the "right" party was never served. The Andover
opinion, however, appropriately recognizes this formalistic argument as inconsistent with § 52-123. A person who happened, among other things, to be an agent of the Town was served, and the Town had notice and could not realistically claim to be prejudiced. Section 52-123 is appropriately applied in this situation to save the cause of action.
In terms of its essential elements, Andover is closely analogous to the instant case. Here, as in Andover, the "right" party and the "wrong" party are distinct legal entities. Here, as in Andover, the "wrong" party was served. Here, as in Andover, at least in terms of form, the "right" party has never been served. But here, as in Andover, the service of process has functionally achieved its purpose. In Andover, service was made upon an assistant town clerk who answered to both the "right" party and the "wrong" party. Here, service was made upon June Piper, who, the evidence makes clear, answered to both the "right" party and the "wrong" party. And here, as in Andover, the "right" party has CT Page 4082-YY had notice all along and cannot realistically argue that it has been prejudiced by the plaintiff's error. Under these circumstances, § 52-123 can be appropriately applied to save the action.
One final similarity between this case and Andover is that, in both cases, the "right" party and the "wrong" party are closely related legal entities. This is an important characteristic. It has long been recognized that the ends of justice will be furthered by allowing the addition or substitution of the "right" party when the "right" party has "a close identity of interest" with the "wrong" party and the "right" party will not be prejudiced. See, e.g., TravelersIndemnity Co. v. United States, 382 F.2d 103, 106 (10th Cir. 1967). The policy behind this consideration is closely related to the underlying purpose of the statute of limitations. "Statutes of limitation," in Justice Jackson's memorable phrase, "are designed to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared." Order of Railroad Telegraphers v. Railway ExpressAgency, Inc., 321 U.S. 342, 348-49 (1944). But if the theory is that "it is unjust not to put the adversary on notice to defend within the period of limitation," id. at 349, that theory is hardly affronted by the "late" substitution of a party that has had notice and the opportunity to defend all along. As a New York court has explained, moreover, "where the parties are united in interest their defenses will be the same and they will either stand or fall together with respect to plaintiff's claim. Timely notice to one of two such defendants will enable [it] to investigate within the statutory period all the defenses which are available to both." Brock v. Bua, 443 N.Y.S.2d 407, 412
(N.Y.App.Div. 1981). For this reason, timely notice to one closely related entity is charged to the other. Id.
This rationale is particularly appropriate in the context of this case, where it is perfectly obvious that notice to the Foundation in the form of service of process on June Piper, a Hospital employee, constituted a fully functional notice to the Hospital. While it is true that the Hospital has never been formally served as such, this was also true of the Town inAndover. For all practical purposes, the Hospital, like the Town in Andover, appeared in the action answered the complaint and otherwise acted as the defendant. See 232 Conn. at 400. In fact, the Hospital went much further than the Town in Andover since it declined to file a dispositive motion and vigorously defended the CT Page 4082-ZZ action on its merits. In these circumstances, for the reasons that have been discussed, § 52-123 allowed the amendment in question to have been made.
What's in a name? As Juliet well knew, the name is not necessarily the essence of the thing. The essence of this case is that the Hospital had notice and defended this matter throughout. Justice permitted it to be made a party. The motion to set aside the verdict and for a new trial is denied.